## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

DONALD BLAIR and DEBBIE HOLLAND, on behalf of themselves, and all others similarly situated,

      Plaintiffs,

v.

BED BATH & BEYOND, INC.,

      Defendant.

### CLASS ACTION COMPLAINT -- JURY TRIAL DEMANDED

### I.    INTRODUCTION

1.    This case involves the marketing and sale of bed linens falsely labeled as "100% Egyptian Cotton" by retailer Bed Bath & Beyond, Inc. ("BB&B"). For years, under the label Perfect Touch and Crowning Touch, BB&B sold bed linens, manufactured by Welspun India, Ltd. ("Welspun"), labeled as "100% Egyptian Cotton." Egyptian cotton, due to its quality and scarcity, commands a premium in the market.

2.    Welspun, a large home textile manufacturer based in India and with offices in the United States, manufactures and distributes bed linens and other home textiles to BB&B and other retailers. BB&B is Welspun's largest customer.

3.    In August 2016, BB&B's competitor, Target announced that its investigation showed that Welspun uses inferior and less expensive cottons in many of its bed linens labeled "100% Egyptian Cotton." Target ended its relationship with Welspun, and Welspun admitted, "Without any ambiguity, the fault is on our side."

4.      In response to Target's announcement, BB&B ordered an external audit of textiles from Welspun but has continued to sell its products. Because of BB&B's conduct, consumers who purchased Welspun bed linens at BB&B overpaid for an inferior product. This action seeks full recompense for consumers.

## II.    PARTIES

### A.    Plaintiffs

5.      Plaintiff, Donald Blair, at all times relevant to this action is a citizen and domiciliary of Pima County, Arizona, and purchased Crowning Touch bed linens manufactured by Welspun from a BB&B store located in Tucson, Arizona.

6.      Plaintiff, Debbie Holland, at all times relevant to this action is a citizen and domiciliary of Cumberland County, North Carolina, and purchased Perfect Touch bed linens manufactured by Welspun from a BB&B store located in Fayetteville, North Carolina.

### B.    Defendant

7.      Defendant Bed Bath & Beyond, Inc. is incorporated in New York, and has its principal place of business at 650 Liberty Avenue, Union, New Jersey. BB&B is a large chain of retail stores selling housewares and home furnishings. BB&B is also the parent company of several entities, including: World Market, Cost Plus World Market, Cost Plus, Christmas Tree Shops, Christmas Tree Shops and That! or and That!, Harmon, Harmon Face Values and buybuy BABY. The company also includes Harbor Linen and T-Y Group, a business-to-business distributor of a variety of textile products, amenities, and other goods to customers in the hospitality, cruise line, healthcare, and other industries.

## III.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiffs and Defendant are citizens of different states and because, upon

information and belief, the aggregate amount in controversy exceeds $5,000,000.00 exclusive of costs and interest.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d). Venue is proper in this District because Defendant resides, transacts business, is found and/or has agents in this District, and part of the affected interstate trade and commerce, as described below, was carried out in this District.  BB&B has also submitted to this venue by litigating other substantively similar cases in this District.

10.      This Court has personal jurisdiction over Defendant Bed Bath & Beyond. BB&B has conducted and continues to conduct business, including operating numerous retail stores in the State of Florida and within this District that have sold Welspun's products that were falsely labeled and marketed as 100% Egyptian Cotton. BB&B has also submitted to this Court's jurisdiction by litigating other substantively similar cases in this District.

## IV.    FACTS

### A.    The Egyptian Cotton Market

11.      Commercial cotton production for export began in Egypt in the 1820s when a Frenchman discovered a species of cotton growing in a fine garden in Cairo. This cotton species, *Gossypium barbadense*, was characterized by unusually fine, long silky fibers or "staples." The fibers of Gossypium barbadense, or Egyptian cotton, had the unique property of being strong enough to withstand the new cotton gin while at the same time being fine enough to create very high thread count textiles.

12.      When the Civil War broke out in the United States in 1861 and disrupted cotton supplies from southern states, Egyptian cotton production skyrocketed. Egyptian cotton soon became synonymous with premium cotton because textiles produced with it were both stronger and softer than textiles produced with other cottons. Indeed, the phrase "Egyptian cotton" has

become synonymous in the consuming public's mind with luxurious high-end extra-long staple cotton, which trades on commodity markets for a premium of 100% or more over regular cotton of low or middle staple length.

13.    For much of the modern era, the production of Egyptian cotton was highly subsidized by the Egyptian government.   Beginning in the 1990's; however, protectionist policies were gradually relaxed under the influence of economic policies advocated by the International Monetary Fund. The result has been a slow decline in Egyptian cotton production, which has been exacerbated by political and economic instability. The U.S. Department of Agriculture predicts that in 2016, Egypt will produce only one-third of the cotton produced in 2006.

14.    Because of falling production, obtaining genuine Egyptian cotton has become increasingly difficult. Because only Gossypium barbadense grown in Egypt can be called Egyptian Cotton, the predictable result has been rampant fraud. Indeed, the Cotton Egypt Association estimates that approximately 90% of cotton marketed as "Egyptian cotton" is not, in fact, Egyptian cotton.

**B.    Bed Bath & Beyond Markets and Sold Welspun bed Linens Falsely Labeled as "100% Egyptian Cotton."**

15.    In corporate presentations, Welspun India claims: "Your comfort is our commitment." Welspun manufactured and distributed bed linens and other home textiles to U.S. retailers, including, but not limited to, Defendant BB&B, Target, JC Penney and Wal-Mart.

16.    In the mid-2000s, Welspun determined that one way to increase those profits was to "move[] up the value chain" in the U.S. market by manufacturing and selling purportedly higher end products. As part of that strategy, Welspun began a concerted campaign to distribute

home textiles, including bed linens, purportedly made from "100% Egyptian Cotton," which would be perceived as "softer and finer" with "higher counts of yarn" *i.e.,* higher thread counts.

17.    On information and belief, BB&B entered into contracts with Welspun to sell its "100% Egyptian Cotton" bed linens and other home textiles at BB&B stores nationwide and online. BB&B sold the "100% Egyptian Cotton" bed linens under the labels, Perfect Touch and Crowning Touch.

18.    On information and belief, BB&B is Welspun's largest retail customer in the United States.

19.    By marketing certain bed linens as "100% Egyptian Cotton," BB&B could sell the bed linens at a premium to bed linens not labeled as "100% Egyptian Cotton."

20.    Sometime prior to August 2016, BB&B's competitor, Target, became aware that Welspun might be substituting cheaper non-Egyptian cotton in its Fieldcrest label bed linens.

21.    On August 19, 2016, after "extensive investigation," Target confirmed that "Welspun substituted another type of non-Egyptian cotton when producing bed linens between August 2014 and July 2016." On the same day, Target terminated its relationship with Welspun.

22.    After Target's announcement, Welspun admitted to its conduct, stating: "Without any ambiguity, the fault is on our side."

23.    Reportedly, BB&B and other retailers, such as JC Penney and Wal-Mart, started investigations.

24.    On or about August 24, 2016, BB&B said that it had ordered an external audit of textiles from Welspun.

25.    In November 2016, BB&B announced that it would continue to do business with Welspun but would no longer sell its bed linens labeled "100% Egyptian Cotton" because

Welspun could not guarantee that the fibers were 100% Egyptian Cotton. A spokesperson for

BB&B stated that the company was "extremely disappointed in these findings."

> **C.     Bed Bath & Beyond's Conduct Violates the U.S. Textile Fiber Products Identification Act**

26.     The Textile Fiber Products Identification Act ("Textile Act"), 15 U.S.C. § 70, *et*

*seq*., and the Rules and Regulations governing it (found at 16 C.F.R. Part 303) apply to the

labeling and advertising of textile fiber products, including bed linens, which are manufactured,

sold, advertised, or offered for sale in commerce.

27.     Textile fiber products covered by the Textile Act are required to have a label

listing the fiber content, country of origin, and identifying the manufacturer or another business

responsible for marketing or handling the item.

28.     The fiber disclosure for cotton products may include the name of a type of cotton,

such as Egyptian cotton, as long the name is truthful and not deceptive.

29.     Under Federal Trade Commission (FTC) guidelines, if the type of cotton is

included in the product label and the product is made from various kinds of cotton, the label must

give the cotton's percentage by weight and make clear that other types of cotton were used to

make the product. The FTC gives the following example, "a sheet that contains 65% Pima

Cotton and 35% Upland Cotton may be labeled "100% Cotton," "100% Cotton (65% Pima

Cotton)," "65% Pima Cotton, 35% Upland Cotton," or "65% Pima Cotton, 35% Other Cotton."

30.     The FTC cotton labeling guidelines go on to say: "If your product contains more

than one kind of cotton, a content statement that claims the product is made of only one type of

cotton is not acceptable. For example, **when a sheet contains 50% Egyptian Cotton and 50%**

**Upland Cotton, a fiber content label that reads, "100% Egyptian Cotton," is**

**unacceptable**.” *See* https://www.ftc.gov/tips-advice/business-center/guidance/calling-it-cotton-labeling-advertising-cotton-products (emphasis added).

31.     Pursuant to the Textile Act, the sale, offering for sale, and/or advertising, of “any textile fiber product which has been advertised or offered for sale in commerce, and which is misbranded or falsely or deceptively advertised” … “is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act.” *See* 15 U.S.C. § 70a.

32.     “A textile fiber product shall be misbranded if it is falsely or deceptively stamped, tagged, labeled, invoiced, advertised, or otherwise identified as to the name or amount of constituent fibers contained therein.” 15 U.S.C. § 70b.

33.     Both manufactures and sellers of textile fiber products, such as BB&B, must comply with the Textile Act. In fact, in 2015, the FTC filed a complaint against BB&B alleging that it marketed and sold rayon textile products falsely described as bamboo. *See U.S. v. Bed Bath & Beyond, Inc.*, No. 15-cv-2129 (D.C.).  BB&B entered into a stipulated judgment with the FTC and was enjoined from violating any provision of the Textile Act. *Id.*, Stipulated Judgment and Order, Dkt. No. 3.

34.     BB&B’s partner, Welspun, is also covered by the Act and is required to maintain records showing compliance with the Textile Act for at least three years. 15 U.S.C.A. §§ 70d(a)-(b). Upon information and belief, such records are located at Welspun’s headquarters.

35.     BB&B’s conduct, as detailed in this Complaint, violates the Textile Act. BB&B sold, offered for sale, and/or advertised bed linens labeled as “100% Egyptian Cotton” when they were not.

**D.      Injury to Plaintiffs**

      **1.   Donald Blair**

36.      In October 2015, Plaintiff Blair visited a BB&B store located at 4811 E. Grant Road in Tucson, Arizona and purchased a set of bed linens.

37.      Plaintiff purchased a set of queen-size Crowning Touch sheets.

38.      In purchasing the bed linens, Plaintiff relied on the fact that the bed linens were labeled "100% Egyptian Cotton." Plaintiff believed that the bed linens were indeed 100% Egyptian cotton, and, because of this, he purchased them because he believed the bed linens were higher quality, softer, and more durable bed linens than other cotton bed linens not made from Egyptian cotton.

39.      BB&B charges more for sheets labeled 100% Egyptian Cotton than comparable sheets made from lesser cotton.  As a result, Plaintiff paid a premium for the bed linens.

40.      On information and belief, these bed linens are among the Welspun bed linens not containing "100% Egyptian Cotton" as labeled. As a result of BB&B's misrepresentation, Plaintiff was damaged and seeks full reimbursement of all monies paid.

      **2.   Debbie Holland**

41.      In 2015, Plaintiff Holland visited a BB&B store located at 5075 Morganton Road in Fayetteville, North Carolina and purchased a set of bed linens.

42.      Plaintiff purchased a set of king-size Perfect Touch sheets.

43.      In purchasing the bed linens, Plaintiff relied on the fact that the bed linens were labeled "100% Egyptian Cotton." Plaintiff believed that the bed linens were indeed 100% Egyptian cotton, and, because of this, she purchased them because she believed the bed linens were higher quality, softer, and more durable bed linens than other cotton bed linens not made from Egyptian cotton.

44.     BB&B charges more for sheets labeled 100% Egyptian Cotton than comparable sheets made from lesser cotton.  As a result, Plaintiff paid a premium for the bed linens.

45.     On information and belief, these bed linens are among the Welspun bed linens not containing "100% Egyptian Cotton" as labeled. As a result of BB&B's misrepresentation, Plaintiff was damaged and seeks full reimbursement of all monies paid.

## V.     CLASS ALLEGATIONS

46.     This action has been brought, and may be properly maintained, under Federal Rules of Civil Procedure 23(a) (1)-(4), 23(b)(3).

47.     Plaintiffs bring this action as a Class Action on behalf of himself and all others similarly situated as a member of a Nationwide Class, defined as follows:

> All persons who purchased bed linens from Bed Bath & Beyond which were manufactured by Welspun and labeled "100% Egyptian Cotton."

48.     Upon further investigation and discovery, other products may be discovered to be falsely labeled "100% Egyptian Cotton," and Plaintiffs reserve the right to amend the class definition.

49.     Excluded from the Class are Defendants; any entity in which Defendants have a controlling interest; any of the officers, directors, or employees of Defendants; and the legal representatives, heirs, successors and assigns of Defendants.

50.     The members of the Class are so numerous and widely dispersed that joinder of them in one action is impractical. On information and belief, there are thousands of class members who have purchased bed linens at BB&B falsely advertised as "100% Egyptian Cotton."

51.     There are common questions of law and fact as to all members of the Class that predominate over any questions affecting individual class members, including but not limited to:

a.   Whether Defendant represented the bed linens as 100% Egyptian cotton when they were not;

b.   Whether Defendant knew that the bed linens were not 100% Egyptian cotton;

c.   Whether Defendant knew it had insufficient evidence upon which to represent the bed linens were made from 100% Egyptian cotton.

d.   Whether Defendant marketed or sold the bed linens as made from 100% Egyptian cotton when in fact they were not.

e.   Whether Defendant charged higher prices for the bed linens that they otherwise would have by labeling them as 100% Egyptian cotton;

f.   Whether Defendant negligently misrepresented the fiber content of its bed linens;

g.   Whether Defendant breached express and implied warranties under state law;

h.   Whether Defendant was unjustly enriched;

i.   Whether Defendant violated state consumer protection  statutes; and

j.   Whether Plaintiffs and class members are entitled to damages, including punitive damages, restitution, injunctive relief, and declaratory relief.

52.    Plaintiffs' claims are typical of the Class they seek to represent. Both Plaintiffs and the Class claims arise out of the same course of conduct and same legal theories. Plaintiffs challenge the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

53.    Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of class members Plaintiffs seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation who intend to vigorously prosecute this action.

54.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the class members is impracticable. Furthermore, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant and the adjudication of this

controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION
### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, et seq.

55.    Plaintiffs reallege Paragraphs 5 through 45 and incorporate each allegation as if set forth at length in its entirety.

56.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), as persons entitled to enforce against the warrantor the obligations of its warranties.

57.    BB&B is a "supplier" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4), because it is "engaged in the business of making a consumer product directly or indirectly available to consumers."

58.    BB&B is a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(5), because it offered a written warranty regarding the nature of the material used to make the linens.

59.    The representations described herein are "written warranties" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6), because they are a written promises made in connection with the sale of a consumer product by a supplier relating to material used to manufacture the linens and affirms that such material is defect free.

60.    In the alternative, the representations described herein are an implied warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7), because the written promises relating to the material used to manufacture the linens are implied warranties under state law, as described herein, and were made in connection with the sale of the product by a supplier.

61.     The Magnuson-Moss Warranty Act sets forth rules governing warranties "to improve the adequacy of information available to consumers" and to "prevent deception." 15 U.S.C. § 2302(a).

62.     The Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer damaged by the failure of a warrantor to comply with a warranty.

63.     BB&B warranted that the products were 100% Egyptian cotton when in fact they were not 100% Egyptian cotton in violation of the express and/or implied warranties made by Defendant.

64.     A reasonable consumer would believe that the representation made by BB&B regarding the type of cotton used in the product was a true and accurate statement.

65.     The representation that the products were made from 100% Egyptian cotton was deceptive.

66.     BB&B breached its warranties, as described in more detail above, and is therefore liable to Plaintiffs and the Class under 15 U.S.C. § 2310(d)(1).

67.     Under 15 U.S.C. § 2310(e), Plaintiffs may bring this class action and need not give Defendant notice or an opportunity to cure until the Court determines the representative capacity of Plaintiff under Rule 23 of the Federal Rules of Civil Procedure.

68.     The amount in controversy of Plaintiffs' individual claims meets or exceeds $25.00. The amount in controversy exceeds $50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined. Plaintiffs, individually and on behalf of the class members, seek all damages permitted by law, including a full refund of the purchase price. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs and the other class members may recover the aggregate costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other class members in the prosecution of this action.

69.     Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  Plaintiffs seek a declaration that BB&B cannot sell linens labeled "100% Egyptian Cotton that are less than 100% Egyptian Cotton."

## COUNT II
## BREACH OF EXPRESS WARRANTY
### New Jersey Law
### N.J. Stat. Ann. § 12A:2-313

70.     Plaintiffs reallege Paragraphs 5 through 45 and incorporate each allegation as if set forth at length in its entirety.

71.     Plaintiffs and class members are "buyers" of goods within the meaning of N.J. Stat. Ann. § 12A:2-103.

72.     BB&B is a "seller" of goods within the meaning of N.J. Stat. Ann. § 12A:2-103.

73.     The bed linens are "goods" within the meaning of N.J. Stat. Ann. § 12A:2-105.

74.     BB&B made an affirmation of fact and described the bed linens as "100% Egyptian Cotton."  This affirmation of fact and description became part of the basis of the bargain with Plaintiffs and consumers.

75.     Therefore, the affirmation of fact and description of the bed linens as "100% Egyptian Cotton" created an express warranty.

76.     BB&B breached the express warranty because the bed linens were not 100% Egyptian cotton.

77.     As a result of BB&B's breach of the express warranty, Plaintiffs and class members were damaged. Specifically, they paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

Plaintiffs have provided notice to Defendants as required by N.J. Stat. Ann. § 12A:2-607.

78.     WHEREFORE, Plaintiffs demand judgment against Defendant, Bed Bath &

Beyond, Inc., for damages, costs, and attorneys' fees and request trial by jury of all issues so

triable.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### New Jersey Law
### N.J. Stat. Ann. § 12A:2-314

79.     Plaintiffs reallege Paragraphs 5 through 45 and incorporate each allegation as if

set forth at length in its entirety.

80.     Plaintiffs and class members are "buyers" of goods within the meaning of N.J.

Stat. Ann. § 12A:2-103.

81.     BB&B is a "seller" of goods within the meaning of N.J. Stat. Ann. § 12A:2-103.

82.     The bed linens are "goods" within the meaning of N.J. Stat. Ann. § 12A:2-105.

83.     The contract for the sale of the bed linens included an implied warranty that they

were merchantable, extending to Plaintiffs and class members.

84.     The bed linens were labeled "100% Egyptian Cotton" but were not in fact 100%

Egyptian cotton. Pursuant to N.J. Stat. Ann. § 12A:2-314, the bed linens, as labeled, did not pass

without objection in the trade under the contract description; conform to the promises or

affirmations of fact made on the container or label; and are not fit for the ordinary purposes for

which such goods are used.

85.     As a result of BB&B's breach of the implied warranty of merchantability,

Plaintiffs and class members were damaged. Specifically, they paid a premium for the bed linens

labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

86.     Plaintiffs have provided notice to Defendants as required by N.J. Stat. Ann. §

12A:2-607.

87. WHEREFORE, Plaintiffs demand judgment against Defendant, Bed Bath & Beyond, Inc., for damages, costs, and attorneys' fees and request trial by jury of all issues so triable.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

88. Plaintiffs reallege Paragraphs 5 through 45 and incorporate each allegation as if set forth at length in its entirety.

89. BB&B represented that the bed linens purchased by Plaintiffs and class members were 100% Egyptian cotton.

90. There is privity of contract between BB&B and Plaintiffs and class members, and BB&B had a duty to give Plaintiffs and class members correct information about its home textile products.

91. BB&B had a duty under the Textile Act to not sell, offer for sale, or advertise home textile products containing false information regarding their fiber content.

92. BB&B was aware that Plaintiffs and other consumers would view their labeling of home textile products as "100% Egyptian Cotton" as a guarantee of superior quality and softness.

93. BB&B intended Plaintiffs and consumers to rely on those representations and pay a premium for the purportedly premium "100% Egyptian Cotton" bed linens. Indeed, the sole purpose of the misrepresentation was to induce Plaintiffs and class members to purchase BB&B's bed linens.

94. Plaintiffs and class members reasonably relied on the representation that the bed linens were "100% Egyptian Cotton" when purchasing the bed linens.

95.     The bed linens purchased by Plaintiffs and class members were not, in fact, 100% Egyptian cotton.

96.     As a result of this misrepresentation, Plaintiffs and class members were injured. Specifically, they paid a premium for "100% Egyptian Cotton" bed linens but received bed linens that were not "100% Egyptian Cotton."

97. WHEREFORE, Plaintiffs demand judgment against Defendant, Bed Bath & Beyond, Inc., for damages, costs, and attorneys' fees and request trial by jury of all issues so triable.

## COUNT V
## UNJUST ENRICHMENT

98.     Plaintiffs reallege Paragraphs 5 through 45 and incorporate each allegation as if set forth at length in its.

99.     BB&B falsely represented that the bed linens purchased by Plaintiffs and class members were 100% Egyptian cotton. BB&B intended for Plaintiffs and class members to rely on its representation.

100.    Plaintiffs and class members reasonably relied on BB&B's representation and suffered a detriment. They paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

101.    BB&B received money, in the form of the premium Plaintiffs and class members paid for the bed linens, to which it was not entitled because the bed linens were not made from 100% Egyptian cotton.

102.    It would be unjust for BB&B to retain the money it was unjustly enriched, specifically premium Plaintiffs and class members paid for the bed linens.

103.    WHEREFORE, Plaintiffs demand judgment against Defendant, Bed Bath & Beyond, Inc., for damages, costs, and attorneys' fees and request trial by jury of all issues so triable.

## COUNT VI
## VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
### N.J.S.A. 56:8-1 *et seq*.

104.    Plaintiffs reallege Paragraphs 5 through 45 and incorporate each allegation as if set forth at length in its entirety.

105.    Plaintiffs and class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1.

106.    BB&B is a person within the meaning of N.J. Stat. Ann. § 56:8-1.

107.    The bed linens are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1.

108.    In connection with the advertisement and sale of bed linens labeled "100% Egyptian Cotton," BB&B misrepresented a material fact. The bed linens were not in fact 100% Egyptian cotton.

109.    BB&B intended that Plaintiffs and class members would rely on its misrepresentation that the bed linens were 100% Egyptian cotton and pay a premium for the bed linens.

110.    Plaintiffs and class members reasonably relied on BB&B's representation and suffered a loss. They paid a premium for the bed linens labeled "100% Egyptian Cotton" but received bed linens that were not 100% Egyptian cotton.

111.    WHEREFORE, Plaintiffs demand judgment against Defendant, Bed Bath & Beyond, Inc., for damages, costs, and attorneys' fees and request trial by jury of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and for members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

a)      Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as Class Representatives;

b)      Costs, restitution, damages, including statutory and punitive damages, and disgorgement in an amount to be determined at trial;

c)      An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

d)      An award of costs and attorneys' fees; and

e)      Such other or further relief as may be appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

Dated: January 24, 2017.                      Respectfully submitted,

*s/Edward H. Zebersky*
Edward H. Zebersky, Esq. (FBN: 0908370)
ezebersky@zpllp.com
Todd S. Payne, Esq. (FBN: 834520)
tpayne@zpllp.com
ZEBERSKY PAYNE, LLP
110 S.E. 6th Street, Suite 2150
Fort Lauderdale, FL  33301
Telephone:  (954) 989-6333
Facsimile:  (954) 989-7781

Robert B. Carey (*pro hac vice* pending)
Leonard W. Aragon (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone:  (602) 840-5900
Facsimile:  (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

[1585273/1]                                        18

and

Stuart M. Paynter *(pro hac vice* pending)
THE PAYNTER LAW FIRM PLLC
1200 G. Street NW, Suite 800
Washington, D.C.  20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@paynterlawfirm.com

**_Attorneys for Plaintiffs_**